**CLERK'S OFFICE**
**A TRUE COPY**
**Aug 16, 2024**
**s/ D. Olszewski**
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A locked black Apple iPhone, with a black case, believed to have telephone number 414-690-4529 (Device A) and a locked Apple iPhone, with a red leather back (Device B), that are currently held as evidence inside the Milwaukee FBI Field Office, more fully described on Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No.    24    MJ    181 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a); | sex trafficking; possession with intent and distribution of controlled substances |
| 21 U.S.C. §§ 841 and 846 | and conspiracy to possess with intent and distribution of controlled substances |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Gary P. Schneider*
_____
*Applicant's signature*

Gary Schneider - TFO - FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means).*

Date: _____ 08/16/2024 _____

*William E. Duffin*
_____
*Judge's signature*

City and state: _____ Milwaukee, WI _____

Honorable William E. Duffin, U.S. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Gary Schneider, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a state certified law enforcement officer, employed as a detective with the Oak Creek Police Department in Milwaukee County, Wisconsin, and have been a sworn officer in the State of Wisconsin for over 28 years. I am currently assigned to FBI's Milwaukee Field Office as a federally deputized task force officer with the Human Trafficking Task Force. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses.

2.  I have participated in numerous complex sex trafficking and narcotics investigations which involved violations of state and federal controlled substances laws including Title 18, United States Code, Section 1591(a), Title 21, United States Code, Sections 841(a)(1) and 846, and other related offenses.

3.  I have received training related to the investigations and enforcement of federal sex trafficking laws. As a result of this training and my experience, I am familiar with the technologies traffickers use to recruit, communicate with, and exploit their victims. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, and distributing sexually explicit images and videos of trafficking victims. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

4. Additionally, I have received training related to the investigations and enforcement of drug trafficking laws. As a result of this training and my experience, I am familiar with the technologies of drug traffickers. I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking operations. I know drug traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and conduct drug trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances. These documents and records and additionally receipts, notes, ledgers, and other documents regarding drug trafficking are often maintained where the traffickers have ready access. These may be stored computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show

2

evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

5. I am familiar with the language used over the telephone and other electronic communications to discuss sex and drug trafficking and know that the language is often limited, guarded, and coded. I am familiar with various code names used to describe controlled substances, as well as various code words used to describe commercial sex acts. I also know that drug traffickers and sex traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

6. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly identified electronic evidence relating to the commission of criminal offenses, including evidence that demonstrates intent, motive, manner, means, and the identity of co-conspirators.

3

7.    This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to "case agents." Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.  Because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

## PURPOSE OF THIS AFFIDAVIT

8.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, namely, several cellular phones in currently within the lawful possession of the FBI.

9.     The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties, and whom I consider to be truthful and reliable.

10.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11.    The property to be searched consists of two cellular phones recovered during the arrests of Mario ROBERTS and Morrell D. JOHNSON on July 8, 2024, in Green Bay, Wisconsin, hereinafter referred as the "**DEVICES**." The **DEVICES** are more particularly described as follows:

4

a) a locked black Apple iPhone, with a black case, believed to have telephone number 414-690-4529, located in the backseat of a blue Buick with license plate ATG7892 near 850 Kepler Drive, Green Bay, Wisconsin, on July 8, 2024, that is currently held as evidence inside the FBI Milwaukee Field Office (**DEVICE A**); and

b) a locked Apple iPhone, with a red leather back, which was inside the purse in hotel room 226 of the Super 8 Motel, 2911 Voyager Drive, Green Bay, Wisconsin, on July 8, 2024, that is currently held as evidence inside the FBI Milwaukee Field Office (**DEVICE B**).

12. There is probable cause to believe that the **DEVICES** listed above have been used as instrumentalities of, and contain evidence of, violations of Title 18, United States Code, Section 1591(a) (sex trafficking) and Title 21, United States Code, Sections 841 (possession with intent and distribution of controlled substances) and 846 (conspiracy to possess with intent and distribution of controlled substances).

13. The applied-for warrant would authorize the forensic examination of the **DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

## <u>PROBABLE CAUSE</u>

14. I am currently investigating multiple sex and drug trafficking offenses involving Morrell D. JOHNSON, a.k.a. "Money," Mario ROBERTS, a.k.a. "Rio," Johnny PICKENS, a.k.a. "J-Money," and other known and unknown individuals. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of recorded jail telephone calls; reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; information obtained from numerous witnesses, documentary evidence; physical and electronic surveillance; and physical seizures.

5

## I. Background of the Investigation

15.     Starting in July 2023, FBI Milwaukee's Criminal Enterprise Squad began conducting surveillance of a two story, duplex located at 735 South 21st Street, Milwaukee, Wisconsin based upon allegations and evidence of sex trafficking and drug trafficking taking place at that address. Case agents observed multiple individuals entering 735 South 21st Street, Milwaukee, Wisconsin for a short period of time and then exiting the residence.  Based on my training and experience, these short-term contacts were consistent with drug trafficking.

16.     Case agents also reviewed Milwaukee Police Department records and learned that an adult female, AV-4 with a history of engaging in commercial sex acts, died from an overdose at 735 South 21st Street, Milwaukee, Wisconsin in April 2023.

17.     During the investigation into the 735 South 21st Street, Milwaukee, Wisconsin, case agents learned, through witness interviews (outline in this affidavit), that a black male by the nickname "Money" was using this location to cause women to engage in commercial sex acts. Case agents were later able to identify "Money" as Morrell JOHNSON when several sex trafficking victims whom they interviewed identified him from a photograph. While investigating JOHNSON, case agents also identified Johnny PICKENS and Mario ROBERTS as associates of JOHNSON who were also believed to be engaged in drug and sex trafficking.

18.     On August 8, 2023, after about two months of surveillance, the Criminal Enterprise Squad and the Human Trafficking Squad attempted a traffic stop of a vehicle leaving 735 South 21st Street immediately after they observed a hand-to-hand narcotics buy outside of that address. The driver of the vehicle refused to stop and took off at a high rate of speed, and a vehicular pursuit was initiated by the Milwaukee Police Department. That pursuit ended in a crash, and a 13-year-old female, hereafter referred to Juvenile Victim 1 (JV-1) was recovered

6

from the front passenger seat. Subsequent interviews with JV-1 stated she was being trafficked by "J-Money". Case agents identified Johnny PICKENS as "J-Money" through jail calls and police records. In Spring of 2024, JV-1 was shown a photo of PICKENS. JV-1 did not identify PICKENS as "J-Money" but instead she laughed and did not provide any further information. In August 2023, JV-1 also said she had been sexually assaulted by "King", identified by law enforcement as Torrance NORMAN. JV-1 was shown a booking photo of JOHNSON and identified him as "Money" but did not provide any further information about him at that time.

## II. Interviews of JOHNSON Sex Trafficking Victims

### A. Adult Victim 1 (AV-1)

19. On August 27, 2023, a few weeks after the traffic stop and pursuit described above, the Columbia County Sheriff's Office stopped a stolen vehicle. Detectives from the Columbia County Sheriff's Office interviewed the adult driver, hereinafter referred to AV-1. AV-1 stated that she had information on sex trafficking on Milwaukee's south side.

20. On September 1, 2023, September 7, 2023, and October 13, 2023 I interviewed AV-1. Initially AV-1 denied by trafficked by "Money" and instead indicated "King" was her trafficker. Eventually AV-1 admitted that she lied, because she was loyal to "Money". AV-1 admitted she was a victim of sex trafficking, being forced to engage in commercial sex acts, by "Money." AV-1 identified "Money" as Morrell JOHNSON from a booking photo. AV-1 said she had known Morrell JOHNSON since they were juveniles. AV-1 stated that JOHNSON also sold drugs.

21. AV-1 described two residences that JOHNSON used for his drug trafficking and sex trafficking: 735 South 21st Street and 3231 West Becher, both in Milwaukee, Wisconsin. AV-1 stated she leased 735 South 21st Street, but the house was run by JOHNSON. JOHNSON

7

used the residence for making crack cocaine and mixing heroin. Additionally, multiple women whom JOHNSON trafficked by forcing them to engage in commercial sex acts for his profit stayed at the houses.

22. AV-1 stated that although she had known JOHNSON many years prior, she had been reintroduced to him in February 2023, when she went to the house at 3231 West Becher, because JOHNSON doing a free handout of crack cocaine and heroin there in an attempt to obtain new drug customers—mainly women engaged in prostitution. AV-1 explained that JOHNSON had observed how much money various women were earning on National and Greenfield Avenues from commercial sex acts, and he wanted AV-1 to recruit these women for him to traffic.

23. AV-1 explained JOHNSON's methods for trafficking women, including herself. AV-1 stated that JOHNSON treated the women to whatever they wanted for the first few days, including providing them with as many drugs (in AV-1's case, crack cocaine) as they wanted. JOHNSON bought the women to get clothes, makeup, and other personal items. During this initial period, JOHNSON did not require the women to engage in commercial sex acts.

24. AV-1 further stated that after the first few days, JOHNSON would start to make his recruits walk the track, meaning streets known for prostitution such as National Avenue in Milwaukee, in order to solicit johns, or commercial sex customers. JOHNSON would also make the women go to hotels to conduct commercial sex dates. He also had them conduct dates at 3231 West Becher, in a back area of the residence. JOHNSON provided the women with cellphones, that were to be used for setting up "dates" (commercial sex acts).

25. AV-1 described JOHNSON's rules for the women he trafficked. AV-1 stated that when JOHNSON's victims returned to 3231 West Becher from doing commercial sex dates,

8

JOHNSON expected them to place all of the money they had earned from their dates on the counter in the kitchen. Each woman had a specified place to put "JOHNSON's" money. The women were also required to place the phones JOHNSON provided them on the counter in the kitchen. JOHNSON had a certain amount of money each woman was supposed to earn.

26.     JOHNSON also provided the women with controlled substances and allowed them to stay at residences he used for storing controlled substances and his victims. JOHNSON also had a rule that the women were not to buy controlled substances from any other drug dealers, only JOHNSON. AV-1 stated she was required to get crack cocaine from JOHNSON, but she would obtain crack cocaine from other dealers at times, risking punishment from JOHNSON.

27.     AV-1 explained that JOHNSON would punish the women in various ways for any failure to follow his rules, including if he perceived them to be disrespectful towards him, or if he felt they had not earned enough money. For example, AV-1 indicated she typically did dates for JOHNSON at hotels in Racine, Kenosha, and Waukegan, however JOHNSON would punish her at times by making her walk the track because it was far more dangerous that working at a hotel.

28.     AV-1 also described how JOHNSON would forcibly administer Narcan, a drug designed to counteract an opiate overdose, when it was not needed as a punishment, because it caused agonizing symptoms.

29.     Additionally, AV-1 witnessed and personally experienced JOHNSON's use of physical violence against his victims as a punishment. AV-1 stated, following her release from custody she was placed at a group home. AV-1 stated she eventually contacted JOHNSON to come get her. JOHNSON did pick up AV-1, but was upset with her. AV-1 described how

9

JOHNSON took her to Waukegan, Illinois. AV-1 was kept at a residence. AV-1 stated JOHNSON covered her with a large couch pillow and beat her torso. AV-1 described a dog that she cared for in the past and loved also being present. JOHNSON took the dog and snapped its neck in front of AV-1, killing the dog. Based on my training and experience, this type of violence to items, animals, or people that a trafficking victims care about is a method of intimidation used by traffickers to get their victims to comply. AV-1 stated a few days later, JOHNSON took her to Racine, Wisconsin. AV-1 was forced by JOHNSON to engage in sex acts at a residence in Racine with up to six men.

30. AV-1 described other violence JOHNSON subjected victims to if they broke his rules. For example, January 2023, while still at 3231 West Becher, AV-1 witnessed JOHNSON beat and force a woman known to her as "Marie" into a dog cage. AV-1 explained that "Marie" had disappeared with one of JOHNSON's cellular telephones for several days. AV-1 indicated that particular telephone was used by JOHNSON to contact his probation agent, and JOHNSON was extremely angry. JOHNSON sent others to look for "Marie" and was willing to provide drugs to his victims for locating "Marie". When JOHNSON gound "Marie", he used a thick dog toy rope to beat "Marie". He also forced "Marie" to have sex with two of the men inside the residence. When "Marie" did not want to, JOHNSON beat her. AV-1 also described rubbing alcohol being sprayed on "Marie's" open wounds. AV-1 stated she helped care for "Marie's" wounds in the bathroom tub at the residence. AV-1 stated that JOHNSON told "Marie" to go inside a dog cage and "Marie" complied. AV-1 described this as punishment. JOHNSON then made "Marie" remain at 3231 West Becher until her injuries healed.

31. AV-1 stated JOHNSON had several firearms during the period she was with him. AV-1 recalled that once when JOHNSON was upset with her, he pushed her against a wall and

10

put the barrel of his firearm inside her month. AV-1 stated that she was afraid of JOHNSON. AV-1 described that this one incident was enough for her to know she needed to comply with JOHNSON.

32.     AV-1 also described a room in 735 South 21st Street that locked from the outside, such that a person could be locked inside. AV-1 stated JOHNSON would punish his victims by locking them in this room at times.

33.     AV-1 stated that on April 12, 2023, one of JOHNSON's sex trafficking victims, referred to hereinafter as AV-4, died while in a bathtub at 735 South 21st Street. AV-1 observed JOHNSON upset with the women who were using heroin and had decided to force them to quit cold-turkey as punishment. JOHNSON forced the women to stay in their own rooms while suffering through withdrawals alone.  Further, JOHNSON ordered the women were not to use heroin or to get any drugs from other dealers. AV-1 later learned from other victims that AV-4 had obtained heroin from another dealer and died of an overdose. Case agent reviewed law enforcement records and determined that AV-4's death was investigated in Milwaukee Police Department report number 231020146, and it was confirmed to be a heroin overdose.

34.     AV-1 explained that JOHNSON would often talk to AV-1 about "retiring" from doing dates and instead operate a dog breeding business. AV-1 stated that JOHNSON had three dogs and that she would take care of them. AV-1 stated she was never able to "retire," however, but instead had to continue to engage in commercial sex acts.  AV-1 described that she now realized JOHNSON was lying to her about "retiring" from commercial sex acts.

35.     Regarding her arrest in August 2023, AV-1 said she was travelling from Milwaukee to Baraboo, Wisconsin to pick up another victim of sex trafficking. AV-1 said

11

JOHNSON had directed her to make the drive to Baraboo on behalf of Torrance NORMAN, another trafficker affiliated with JOHNSON.

36.    Case agents obtained consent from AV-1 to review the contents of her cell phone following her arrest. Case agents located messages and calls between AV-1 and a number associate with JOHNSON that were consistent with her statements. Case agents also noted photos of receipts and cash on AV-1's phone. AV-1 explained she was required to take photos of the money she obtained from her dates and send the photos to JOHNSON as verification that she had been paid, so that he would know how much money to expect from her when she was finished. If she used any of the money from the date, she was required to provide JOHNSON with proof of what she used the money for in the form of receipts.

37.    AV-1 identified multiple other sex trafficking victims, including AV-4. AV-5, AV-6, and AV-2, discussed below in section C.

### B.  Overdose Investigation

38.    On Thursday February 1, 2024, detectives from the Milwaukee Police Department Violent Crimes Division responded to 8559 North Granville Road, unit 207, in Milwaukee, Wisconsin for a non-fatal overdose involving a 15-month-old female. JOHNSON had previously provided his probation agent with this address as a home address. The 15-month-old overdose victim was JOHNSON's child. According to the child's mother, Shamarra Furgeuson, JOHNSON was at the apartment a short time before the child overdosed. The mother could not explain how her 15-month-old could have overdosed. During a Mirandized interview, Furgeuson also stated that JOHNSON did not work, but if she ever need help with anything, JOHNSON would be there to help.

12

39. During a consent search of the apartment, law enforcement recovered ammunition, magazines for four different guns, suspected marijuana in a kitchen cabinet, ten digital scales with white powder residue in the kitchen, and an open box of sandwich baggies.

40. Law enforcement spoke with A.F.-C., a child who was also present at the residence during the overdose. A.F.-C. was another child of Shamarra Furgeuson,

41. A.F.-C. stated she went with others to the hospital when her sister stopped moving. A.F.-C. stated that she was taken back to the house, on North Granville Road. A.F.-C. stated that her "father" was at the residence. Law enforcement believed JOHNSON was the individual A.F.-C. referred to as "father" based on their investigation. Case agents do not believe JOHNSON is A.F.-C.'s biological father based on the investigation; however, they are aware that JOHNSON would stay at 8559 North Granville Road, unit 207, in Milwaukee, Wisconsin. Further, during the investigation, case agents learned that JOHNSON had a child in common with A.F.-C.'s mother, Shamarra Furgeuson. Case agents believe this may be why A.F.-C. would refer to JOHNSON as her father.

42. A.F.-C. stated that JOHNSON was upset and cursing because he did not know that they were going to another hospital with the baby. A.F.-C. stated JOHNSON was taking a lot of money out of the residence, which was usually kept underneath her mother's bed. A.F.-C. stated that she observed JOHNSON take at least four cell phones of various colors out of the residence and that JOHNSON had a small black gun in his pants pocket. A.F.-C. told law enforcement that JOHNSON did not work. When asked to explain, A.F.-C. stated that JOHNSON steals from other people, brings the money home and counts it at the kitchen table. A.F.-C. stated that JOHNSON often has friends over that he played "duck-duck goose" with and that JOHNSON lives at the residence her family. A.F.-C. also stated that JOHNSON picks her up

13

from school some days. A.F.-C. stated her mom and JOHNSON often argued about JOHNSON not being home.

43. A.F.-C. was forensically interviewed on February 15, 2024. A.F.-C. discussed how her baby sister stop breathing when they were eating and being rushed to the hospital by her mother. A.F.-C. stated her dad was mad because her mom took the baby to the hospital. Case agents believed A.F.-C. referred to JOHNSON as her dad, though they do not believe JOHNSON is biologically A.F.-C.'s father. A.F.-C. described going back to her home, which case agents knew was located at 8559 North Granville Road, 207, Milwaukee, Wisconsin. A.F.-C. stated the house was a mess and stuff was everywhere. A.F.-C. stated her mom and dad would fight. A.F.-C. stated that her dad would chock her mom and called her the "B-word" and "F-word", and "a stupid bum." A.F.-C. stated that her dad goes to friends' houses and gas stations. A.F.-C. stated that her dad does not have a regular job and steals money from strangers and keeps that money in a box in the closet. A.F.-C. saw a lot of money in that box. A.F.-C. also stated the her dad has big and little guns in the house and hides them in the closet. A.F.-C. discussed that her dad took the guns, phones, and money out of the house. A.F.-C. stated her dad does not have many people come visit at the house and only family comes around.

44. Another young child, I.M. was also present during the overdose incident and was forensically interviewed. I.M. stated she was playing in another room when her TT Lucy screamed and cried that the baby was not breathing. I.M. believed the baby had eaten white rice with gravy and soy sauce out of a bowl and suddenly stopped breathing. I.M. described that TT Lucy splashed water on the baby's face trying to wake her but the baby did not awake. I.M. stated TT Lucy ran out of the house with the baby with no shoes on and told everyone to hurry to the car so they could go to the hospital. It was not until they got to the hospital that the baby

woke up. I.M. stated her uncle Rell (believed to be Morrell JOHNSON), was upset that the baby was taken to the hospital. I.M. stated her uncle Rell knocked down the microwave and messed up the bed and closet. I.M. stated her uncle Rell would visit Illinois a lot to see his mother and friends.  I.M. stated she would chill, watch Netflix and YouTube, and play games when she went with Rell to Illinois. AV-1 recalled one time when Rell helped her bake cookies at his mother's home.  I.M. stated her uncle Rell worked at an unknown Walmart location and when she went there she saw him helping people find items they were looking for. I.M. never saw uncle Rell with any guns, any scales, little bags, or ever smoke. I.M. said she thought uncle Rell was lying about some stuff but would not elaborate more on the subject.

45.     Case agents are aware that JOHNSON is on probation with the Wisconsin Department of Corrections (DOC) for Manufacturing or Delivering Heroin under Kenosha County Case number 2018CF651. Case agents were told that DOC issued a warrant for JOHNSON's arrest following the overdose incident.

### C.  Adult Victim 2 (AV-2)

46.     Between June 25, 2024 and July 9, 2024, case agents interviewed an adult female, hereinafter referred to AV-2, while she was in State custody on a pending, unrelated theft case. AV-2 identified JOHNSON, whom she knew as "Money," from a booking photo, as someone who had forced her to engage in commercial sex acts between October 2022 and January 2023.

47.     AV-2 first met JOHNSON in approximately October 2022 at a rental house in the area of South 22nd Street and West National Avenue in Milwaukee that JOHNSON was just moving into. At that time, AV-2 was buying her drugs from someone she knew as "J-MONEY," whom she identified from a booking photo as Johnny PICKENS. It was PICKENS who brought AV-2 to the house on 22nd and National.

15

48.     AV-2 stated she and a friend of hers used heroin at the residence. AV-2 was irritated that JOHNSON was drunk and kept touching her drugs. She started to confront JOHNSON, however PICKENS quickly advised AV-2 that the heroin he sold her came from JOHNSON. PICKENS said JOHNSON was the "brick man" who supplied PICKENS with large amounts of heroin and cocaine.

49.     AV-2 indicated she slept at the residence at 22nd and National that night and was eventually woken up by a maintenance man after he entered the residence and saw drugs laying all over the kitchen counter. When the maintenance man left, AV-2 went back to sleep, however shortly thereafter, JOHNSON woke her up and told her they had to leave because they were being kicked out.

50.     A day later, AV-2 saw JOHNSON at another house in the area of South 22nd Street and West National Avenue. While there, JOHNSON asked AV-2 questions about her life and her goals. JOHNSON told AV-2 he could help her get off drugs, buy a home, start a career in interior decorating, and regain custody of her children. At first, AV-2 was concerned that JOHNSON was really interested in a sexual or romantic relationship with her. After JOHNSON reassured her that he just wanted to be friends and to help her, AV-2 felt at ease with JOHNSON. AV-2 perceived JOHNSON as being kind and felt she could trust him do to the things he promised.

51.     The same night AV-2 agreed to let JOHNSON help her, he drove AV-2 to the Excel Inn in Mount Pleasant, Wisconsin. There, JOHNSON introduced AV-2 to a man she came to know as "Alan" who was also staying in a room rented by JOHNSON at the Excel. AV-2 described "Alan" as a black male in his early 50s who had a family and a job, but who had lost everything after JOHNSON started supplying him with crack cocaine. JOHNSON told AV-2 that

16

"Alan" would be at the motel to assist AV-2 with anything she needed. In hindsight, however, AV-2 believed JOHNSON directed Alan to watch her and report her activities back to him.

52. When they arrived at the Excel, it appeared to AV-2 that JOHNSON was already renting the room where he had her stay. When they entered the room, AV-2 saw JOHNSON move a ceiling tile so that he could hide a brick of heroin. When JOHNSON moved the tile, AV-2 could see that JOHNSON already had several other bricks of heroin and cocaine stored in the ceiling. Before he left, JOHNSON placed a smaller quantity of heroin on the dresser for AV-2.

53. JOHNSON told AV-2 she could invite some friends to the hotel, so AV-2 had three of her friends come over. AV-2 stated that JOHNSON tried to recruit these other women to engage in commercial sex acts for him, however none of the women agreed to do so.

54. For approximately two weeks, JOHNSON continued to have AV-2 stay at the Excel Inn. She did not have to perform commercial sex dates while she was there, and JOHNSON took her on shopping trips where he gave her hundreds of dollars to purchase makeup and clothing. JOHNSON also had AV-2 accompany him most days when he would buy and sell drugs in the areas of Racine, Wisconsin and Waukegan, Illinois.

55. While AV-2 enjoyed not having to do dates and having things bought for her. AV-2 also felt isolated at the Excel Inn. While there, she was dependent on JOHNSON for money, food, and transportation. AV-2 also did not have a phone at the time.

56. After AV-2's two weeks at the Excel Inn, JOHNSON directed AV-2 to sign a lease for a unit on the first floor of a multi-unit residence at 3231 West Becher Street in Milwaukee. Meanwhile, JOHNSON had Alan lease an upstairs unit in the same building.

57. JOHNSON initially told AV-2 that the unit she leased was going to be used for them to start building their lives in the manner he had previously promised. Shortly after AV-2

17

signed the lease, however, JOHNSON admitted he was going to turn it into a trap house, meaning a location used for storing and selling drugs, as well as for commercial sex acts.

58. Around this time, JOHNSON introduced AV-2 to a man named Jamal ISSA, whom she called "Melly." JOHNSON suggested that AV-2 and Melly should start dating, and they became a couple. Melly also moved into the apartment at 3231 West Becher. Over time, AV-2 came to believe that JOHNSON wanted to avoid his trap house being detected by making it appear that AV-2, who was on the lease, was simply living there with her boyfriend.

59. Besides AV-2, JOHNSON, and ISSA, a handful of different women who performed commercial sex acts at JOHNSON's direction and a male who went by "Mississippi" lived in the house. JOHNSON had Mississippi cook for everyone with food purchased with AV-2's FoodShare benefits.

60. AV-2 stated that shortly after they moved into 3231 West Becher Street, JOHNSON held a "smoke out," which AV-2 described as JOHNSON giving out drugs for free in a party/social setting. JOHNSON wanted AV-2 and ISSA to go out on National Avenue and invite a large number of female drug users. AV-2 asked JOHNSON if they should invite any men. He told her they could invite "a few," but he did not want black males there because he saw them as competitors who would try to steal the women. AV-2 explained that JOHNSON was trying to transition from being a drug dealer to being a pimp, so and the smoke out was designed less for JOHNSON to attract drug customers, and more for him to recruit women to work for him performing commercial sex dates.

61. AV-2 stated that when she and ISSA went out to find women for the smoke out, she found AV-1, whom she knew only by her nickname but identified from a photo. AV-2 stated AV-1 brought about 15 other women in her vehicle to 3231 West Becher Street. At the smoke

18

out, JOHNSON gave out approximately an ounce of cocaine and an ounce of heroin to each woman, and he talked to each of the women in attendance, trying to persuade them to "work" (engage in commercial sex acts) for him. AV-2 says some of them agreed, including AV-1, two women hereinafter referred to as AV-4 and AV-5 (whom AV-2 knew by nicknames already known to case agents from their interviews with AV-1 as someone who performed commercial sex acts for JOHNSON), and someone AV-2 knew as "Crazy Carey."

62.     AV-2 stated that all of these women came to work for JOHNSON. AV-2 described AV-1 as being "obsessed" with JOHNSON and said AV-1 acted as his enforcer, beating women at JOHNSON's direction. AV-2 felt that AV-1 never got punished and was "sneaky." AV-2 described AV-4 as being addicted to heroin and said that AV-5 was JOHNSON's main girl. AV-2 said she did not get along with AV-5.

63.     AV-2 believes she was seen as a mom-type figure at the Becher address. She would tell the women they did not have to work the streets and that they could, instead, work from the safety of a house and make more money from dates arranged online.

64.     Commercial sex acts would take place in a room near the back entrance of the Becher Street address. AV-2 stated JOHNSON had the women direct customers to the back door and not allow them to come any further into the house than the room where the dates took place. The back entrance had three parking spaces that commercial sex buyers would use when they visited.

65.     AV-2 stated that AV-5 would post commercial sex ads on the websites Backpage2 and Megapersonals. AV-2 posted on Megapersonals and would occasionally walk the "blade" or "track" to solicit commercial sex dates.

66. AV-2 stated that she has seen JOHNSON with "brick"-sized amounts of heroin and cocaine. She said JOHNSON kept his drug stash, including fentanyl, in a safe in the bathroom of the upstairs apartment rented under Alan's name. AV-2 stated she also saw JOHNSON mix drugs in the kitchen of that upstairs unit.

67. AV-2 stated that JOHNSON also kept drugs at his home in Brown Deer, Wisconsin, where the mother of JOHNSON's child stayed. AV-2 recalled being driven by Alan to JOHNSON's residence in Brown Deer so that AV-2 could give JOHNSON her earnings from a commercial sex date at the Potawatomi Hotel & Casino.

68. AV-2 said JOHNSON had told her that he got the drugs he sold from Arizona and Mexico. AV-2 had seen JOHNSON wiring money to Mexico via Western Union, purportedly for drugs. She also remembered JOHNSON making plans to travel to Arizona and asking her to come with him, however she ultimately did not make the trip.

69. AV-2 stated JOHNSON considered himself a "chemist." AV-2 described that JOHNSON created a special, unknown mixture of drugs that he used to control AV-2. JOHNSON gave this same mixture to ISSA. AV-2 explained that even though JOHNSON told her he was giving her heroin laced with fentanyl, she felt it was something else. One reason was because when AV-2 tried to buy those drugs from other dealers, the drugs they gave her did not help get her "unsick;" only what JOHNSON gave her helped her recover from withdrawals. AV-2 also stated that when other girls borrowed drug paraphernalia from her, such as "cookers," they sometimes experienced very strange reactions or became sick. Also, on at least one occasion when AV-2 expected to test positive for heroin and fentanyl, in relation to a child custody matter, she tested positive for Buprenorphine and other unknown substances instead.

20

70.     AV-2 described another residence that JOHNSON moved to later located at 21st and National (identified by case agents as 735 South 21st Street, Milwaukee). AV-2 stated JOHNSON used this location the same way he used the house on Becher, for selling drugs, cooking crack cocaine, mixing heroin, and prostitution.

71.     She recalled that while at 3231 West Becher Street, one of JOHNSON's dogs overdosed on JOHNSON's drugs. AV-2 stated that JOHNSON left the dead dog's carcass filled with needles at the location.

72.     AV-2 stated that JOHNSON would provide his victims with phones to set up sex dates and communicate with him. AV-2 also stated that JOHNSON had a lot of phones during the time she was with him. AV-2 stated JOHNSON would change out the women's cellphone devices daily.

73.     AV-2 stated that JOHNSON housed his victims and gave them drugs. The value of the drugs JOHNSON gave AV-2, however, was never as much as the amount of money she had earned for him from the dates.

74.     AV-2 described some of the rules JOHNSON had for his victims. JOHNSON required the women to buy their drugs only from him. If dates were performed, JOHNSON had to know about the dates in advance, including how much the dates were for, and the women could not talk to black men. The victims could only use the phones JOHNSON provided to communicate with or about dates. JOHNSON always had access to their phones and could go through their phones whenever he demanded.

75.     AV-2 stated that JOHNSON is violent, and that his violence was usually tied to the victims' failure to follow JOHNSON's directions.

21

76. AV-2 recalled that the first time JOHNSON was violent with her was in November 2022. After an argument, JOHNSON told AV-2 and others who were present that anyone who wanted to leave should go. When AV-2 responded that she was leaving, however, JOHNSON told her she could not because she knew too much about his operations. JOHNSON backhanded AV-2 and threatened to have his "shooters" kill her, taunting her that they would love to chase her around Milwaukee.

77. AV-2 estimates that JOHNSON beat her approximately once a week while she worked for him. These beatings often stemmed from AV-2 breaking JOHNSON's rules by buying drugs from other dealers or speaking her mind. They also were frequently caused by AV-5 telling JOHNSON lies about AV-2.

78. AV-2 also stated that some of the beatings related directly to the dates she did for JOHNSON. One example was a time when AV-2 used the cash she had earned from a date to buy drugs instead of giving the money to JOHNSON. JOHNSON found out and backhanded or smacked AV-2 multiple times.

79. AV-2 explained that JOHNSON's violence toward her, as well as his other sex trafficking victims, influenced her to comply with JOHNSON's demands and rules, including about earning money for him from commercial sex dates.

80. AV-2 stated JOHNSON would sometimes punish AV-2 and other women by forcing them to take Narcan up their noses, causing painful withdrawals. AV-2 she would hold her breath when JOHNSON administered Narcan to her, then turn away from JOHNSON to shoot it out without him noticing. AV-2 once told AV-5 about her technique, and AV-5 told JOHNSON. As punishment, JOHNSON administered Narcan to AV-2 while she was sleeping. JOHNSON then woke up AV-2 and told her what he had done. JOHNSON took away AV-2's

22

blankets away, causing her to suffer chills, and locked her in her room suffering from withdrawal symptoms. AV-2 explained that these were worse than usual because she was not high at the time the Narcan was administered.

81.     AV-2 further stated that if women were not following JOHNSON's rules, he make them walk the "blade" soliciting for sex dates instead of posting online ads. AV-2 explained walking the "blade" was a punishment because the inability to screen clients before getting in the car with them, as compared with dates set up over the phone, made this type of work more dangerous. Furthermore, working on the street put the women in danger of being arrested. AV-2 also stated that street dates were typically for less money, meaning it took longer to hit JOHNSON's quota. AV-2 also stated it was tiring to walk up and down the street, and that it was often unpleasant if the weather was bad.

82.     AV-2 described while living 3231 West Becher Street, she saw a video on PICKENS' phone of "Marie", another victim of JOHNSON, in a dog cage. AV-2 explained, that PICKENS told her, that he was at 3231 West Becher Street to pick up drugs from JOHNSON. While inside the residence, PICKENS saw "Marie" in the dog cage. PICKENS told AV-2, that JOHNSON then asked PICKENS if PICKENS wanted a "blowjob" (penis to mouth sexual intercourse). PICKENS declined but thought it was funny. AV-2 stated, JOHNSON sent PICKENS a video "Marie" in the dog cage. AV-2 stated she then watched this video on PICKENs' phone. AV-2 stated she was told that "Marie" took the iPhone JOHNSON used to speak with his children. JOHNSON put out a cash reward to locate "Marie", and someone brought "Marie" back to JOHNSON. As punishment, JOHNSON put "Marie" in an ice bath, and he scrubbed "Marie's" body raw using a toilet brush and bleach. JOHNSON also beat "Marie" with a very thick dog rope toy, then put her naked into a dog cage. For the next three days,

23

JOHNSON forced "Marie" to perform penis to mouth sexual intercourse on all of the men who came through the house. If "Marie" did not act like she was enjoying performing oral sex, JOHNSON made her do it a second time. AV-2 stated that part of this conduct was captured on the video she saw on PICKENS' phone. JOHNSON also boasted to AV-2 about his violence against "Marie" on numerous occasions.

83.     AV-2 also heard from ISSA that JOHNSON had locked another victim, hereinafter referred to as AV-6, in a dog cage at 735 South 21st Street. AV-2 described JOHNSON locking women in their rooms at 735 South 21st Street in an attempt to have them go through withdrawals from heroin.

84.     AV-2 described a time in December 2022 when JOHNSON drove her in a rental car to a ski resort in Duluth, Minnesota to engage in commercial sex acts. She explained that it was common for JOHNSON to travel with victims for them to do dates, however AV-2 only made one out-of-state trip with JOHNSON. JOHNSON would sometimes post commercial sex ads for his victims in many different cities at once to see where they would gain the most traction. In this instance, JOHNSON posted ads on Megapersonals.com and got responses for an ad with photos of AV-2 posted for the Duluth market. AV-2 stated JOHNSON also brought two additional victims, AV-5 and AV-6, as well as Alan, to Duluth.

85.     While they were Minnesota, JOHNSON drove AV-2 to a commercial sex date about an hour away (but still in Minnesota). AV-2 received $600 in exchange for a sex act, and she gave the money to JOHNSON.

86.     JOHNSON had instructed AV-2, AV-5, and AV-6 not to bring any needles with them to the resort where they were staying to avoid attracting attention. AV-5 and AV-6 typically smoked their drugs, so this was not a problem for them, but AV-2 used the drugs she

24

was addicted to intravenously and could not avoid using needles. While they were in Duluth, AV-5 saw AV-2 drop a needle, and AV-5 told JOHNSON. JOHNSON became angry and told AV-2 he would not give her any more drugs. AV-2 began texting people back home, including her mother, sharing her location and trying to find a ride back to Wisconsin. When JOHNSON discovered this, he smashed AV-2's phone, telling her now her family would never be able to find her. Shortly thereafter, JOHNSON had Alan drive everyone back to Milwaukee in the rental car.

87. After they returned to Milwaukee, AV-2 and ISSA went to ISSA's sister's residence, located at 108th and Greenfield. That same day, despite his statements while in Minnesota, JOHNSON came by ISSA's sister's house to drop off drugs for AV-2 and ISSA. Later that night, JOHNSON and two other males came to the trailer and "stomped" AV-2. JOHNSON claimed that his delivery of drugs had been a test, and that AV-2 and ISSA had failed by using them. JOHNSON and the others also accused AV-2 of being the one who got ISSA addicted to drugs. One of the males pointed a firearm with a laser beam at AV-2's head. AV-2 described the other male as 18 or 19 years old, from Chicago, and someone known as a "shooter" for JOHNSON.

88. Not long after this incident, AV-2 left JOHNSON. JOHNSON told AV-2 that if she was leaving, she would have to leave all of her possessions behind. AV-2 believed her safety depended on her leaving, so she abandoned all of her property and left.

**D. Adult Victim 3 (AV-3) and Green Bay Arrests of JOHNSON and ROBERTS**

89. On July 8, 2024, JOHNSON was arrested in Green Bay, Wisconsin along with Mario ROBERTS. Also present at the scene of the incident was an adult female, hereinafter referred to AV-3, who initially identified herself using a false name. AV-3 later admitted that she

25

had lied about her name because she was afraid of being arrested for her involvement in prostitution and had a warrant for her arrest.

90. Case agents reviewed Green Bay Police Department report 24-235279 and learned that on July 8, 2024, the Green Bay Police Department had received a teletype from the Milwaukee Police Department requesting a welfare check on AV-3 at a Super 8 Motel in Green Bay. The teletype relayed that an Uber driver had walked into Milwaukee Police Department District 4 to report that he was concerned after dropping off three individuals at the Super 8, identified by law enforcement as JOHNSON, ROBERTS, and AV-3. The Uber driver stated he believed AV-3 was in danger and needed help.

91. Green Bay Police Department responded to the Super 8 intending to conduct a knock and talk at AV-3's room. At that time, they observed JOHNSON and Mario ROBERTS walking in the hallway of the hotel.

92. Police chased after JOHNSON and ROBERTS but lost sight of the two men. At that time, the Green Bay Police Department received a 911 call from telephone number 414-690-4529 reporting that there had been a shooting at a nearby Culver's restaurant. It was later determined that JOHNSON made that 911 shooting call while he was hiding in a dumpster, near 850 Kepler Drive, Green Bay, Wisconsin, to deflect law enforcement attention and resources away from himself.

93. JOHNSON was taken into custody after he was seen crawling out of a dumpster and entering a blue Buick with license plate ATG7892 that arrived to pick him up. The Buick was pulled over near the dumpster in Green Bay, Wisconsin. Officers stopped and searched the car, and in the backseat, they found **DEVICE A**, a locked Apple iPhone in a black case. Officers called telephone number 414-690-4529, which was used to make the 911 call regarding the false

26

shooting. **DEVICE A,** the black iPhone in the back seat of the blue Buick began to ring. **DEVICE A** was inventoried by the Green Bay Police Department and later turned over to the FBI Milwaukee Field Office.

94. Meanwhile, officers located AV-3 in her hotel room, along with a male whom AV-3 identified as a "trick," meaning a commercial sex customer. AV-3 and this customer were separated and interviewed, and the customer told Green Bay Police that AV-3 had told him AV-3 wanted to leave the hotel with him because she had been beat up.

95. Green Bay Police Department spoke with AV-3 while still inside the hotel room at the Super 8 Motel, located at 2911 Voyager Drive, Green Bay, Wisconsin. AV-3 provided a false name to officers. AV-3 denied saying anything to the Uber driver. AV-3 denied being upset during the trip to Green Bay, but stated she and ROBERTS got into an argument about 45 minutes before officers arrived. AV-3 provided false information about knowing the "trick" and about being engaged in commercial sex acts. While speaking with AV-3, officers observed a purse on the sink in the motel room. Officers observed about $300 inside the purse. Also located inside the purse was a locked Apple iPhone in a case with a red leather back (**DEVICE B**). AV-3 stated **DEVICE B** was ROBERTS' cellphone. AV-3 used a phone that was located on the motel dresser, identified as AV-3's cellphone, to call a ROBERTS' cellphone number. When AV-3 did this, **DEVICE B** inside AV-3's purse rang. **DEVICE B** was inventoried by the Green Bay Police Department and later provided to the FBI Milwaukee Field Office. Officers were concerned that AV-3 was suffering affects from drug use and took her to the hospital. AV-3 denied using any drugs to officers but reported using valium to hospital staff. AV-3 also reported being 11 weeks pregnant, but officers later determined she was not pregnant.

27

96.     While talking with AV-3 at the hotel, officers also located ROBERTS, who stated he needed medical attention for a recent untreated gunshot wound to his calf. ROBERTS stated that the wound occurred at the Sundown Motel, located at 10515 West Appleton Avenue in Milwaukee. According to AV-3, JOHNSON shot ROBERTS during a disagreement.

97.     JOHNSON and ROBERTS both had outstanding probation violation warrants from the Wisconsin Department of Corrections, so they were placed under arrest.

98.     Case agents and the Green Bay Police Department interviewed the Uber driver, Adult Citizen 1(AC-1), who had driven AV-3, ROBERTS, and JOHNSON from Milwaukee to Green Bay and asked Milwaukee Police Department for the welfare check. AC-1 said he picked up a fare from a man named "Eric" (later determined by case agents to be an alias for JOHNSON) at 8551 N. Granville Road, Milwaukee. AC-1 stated AV-3 made one phone call during the trip to Green Bay.  During the call, one of the males told AV-3 to hang up the phone after AV-3 stated "I'm okay".  AC-1 stated AV-3's phone rang an additional time during the trip to Green Bay and one of the males told her not to answer the phone. AC-1 observed that AV-3 appeared to be crying and/or had tears in her eyes during the trip to Green Bay.  AC-1 explained that AV-3 appeared to have mascara around her eyes that had been running and that AV-3 was wiping the mascara off her face.  AC-1 relayed that during the ride between Milwaukee and Green Bay, AV-3 asked him several questions. AC-1 heard JOHNSON whisper to ROBERTS, "Keep your bitch in line" or "get control of your woman."  AC-1 stated that once they got to the hotel in Green Bay, as AV-3 was exiting the vehicle, she whispered the word "please" to him. AC-1 believed this was AV-3 asking for help. AC-1 stated one of the males put his head in the car and asked AV-3 what she said to AC-1.  AV-3 stated she did not say anything, and AC-1 told

28

the male the same thing to cover AV-3. Case agents showed AC-1 booking photos of JOHNSON. AC-1 identified JOHNSON as "Eric".

99. Officers also spoke with a front desk employee at the Super 8, hereafter referred to as Adult Citizen 2 (AC-2). AC-2 stated that AC-2 had seen AV-3 at the front desk earlier that day and that AV-3 looked scared. AC-2 asked AV-3 if she wanted AC-2 to call 911, but AV-3 said no. AC-2 explained that later on, AV-3 returned to the front desk and appeared upset. This time, AV-3 asked AC-2 to call the police on her behalf because she was struck her in the head.

100. Between July 12, 2024, July 22, 2024, and August 6, 2024, case agents interviewed AV-3 regarding her victimization by ROBERTS and JOHNSON. AV-3 stated that she was in a relationship with ROBERTS. AV-3 stated that around three weeks before the Green Bay incident described above, she and ROBERTS went to the Sundown Motel in Milwaukee. Based on review of AV-3's cell phone, pursuant to consent from AV-3, this likely occurred closer to the end of May 2024. AV-3 stated when they got to the Sundown Motel she met someone "Money" or "Eric," whom she identified as JOHNSON from a booking photo.

101. AV-3 stated that JOHNSON had several motel rooms rented for women whom he was directing to engage in commercial sex acts. AV-3 stated she knew this based on statements JOHNSON made, what she observed, and statements made by some of the women. AV-3 identified two of other women engaged in commercial sex acts for Money, AV-5 and AV-7.

102. AV-3 stated she was also doing dates, meaning engaging in commercial sex acts, at the motel, but she denied it was for JOHNSON or ROBERTS. AV-3 stated ROBERTS did not have a job and would take the money she earned from her sex dates. AV-3 also described times ROBERTS was violent with her.

29

103. AV-3 stated that at first, she and ROBERTS would buy drugs from JOHNSON. AV-3 stated JOHNSON kept the drugs in a motel room, and she observed JOHNSON with large quantities of drugs, including crack cocaine, methamphetamine that looked like crystals, and what JOHNSON said was heroin. AV-3 did not believe it was only heroin though, based on the way her body reacted after she used some of the heroin.

104. AV-3 stated JOHNSON would travel to Green Bay with women and drugs. AV-3 stated JOHNSON had a black Dodge Charger with Illinois license plate, but would not use his care to go to Green Bay, instead he would use different ride share businesses. The women would engage in commercial sex acts for JOHNSON, and JOHNSON would sell the drugs in the Green Bay area. AV-3 stated JOHNSON had two other men who were working for him selling drugs, "Ricky" and "JJ." AV-3 stated "Ricky" and "JJ' would also watch over the women when JOHNSON was not around and report back any issues to JOHNSON. AV-3 said ROBERTS eventually started to sell drugs for JOHNSON too. JOHNSON gave ROBERTS a phone for use when selling drugs for JOHNSON.

105. AV-3 stated **DEVICE B,** found in AV-3's purse at the Super 8 (the locked Apple iPhone in a case with a red leather back), was the phone JOHNSON provided ROBERTS for selling drugs and communicating with JOHNSON about drug dealing. AV-3 stated **DEVICE B** could not dial out and it appeared like JOHNSON could only communicate with **DEVICE B**.

106. AV-3 said she communicated with JOHNSON via cell phone as well, however she observed JOHNSON with multiple cellphones. AV-3 stated she would communicate with JOHNSON using texting apps.

107. AV-3 stated that JOHNSON would arrange for rideshare services to take ROBERTS from Milwaukee to Green Bay in order to sell methamphetamine. AV-3 stated she

30

believed the methamphetamine was already in Green Bay, waiting for ROBERTS to sell. AV-3 described how ROBERTS went to Green Bay. AV-3 stated she was scared for herself and ROBERTS. AV-3 stated the reason she was scared, was because JOHNSON described how he beat a girl with a frying pan and then yelled at her for bleeding on the carpet. AV-3 stated JOHNSON stated the beating was in relation to the girl stealing a television. AV-3 was afraid of JOHNSON based on his stories of violence and the way he spoke with authority.

108. AV-3 stated she went with JOHNSON and ROBERTS three times to Green Bay. Consistent with this statement, case agents located online commercial sex ads for AV-3 posted for the Green Bay area on May 29, 2024; June 21, 2024; and July 8, 2024. AV-3 stated every time they went to Green Bay, JOHNSON would order an Uber or other type of rideshare from his phone.

109. AV-3 stated that her first trip to Green Bay with JOHNSON also included ROBERTS and an unknown female. AV-3 stated the reason they went to Green Bay was for JOHNSON and ROBERTS to sell drugs and for AV-3 and AV-7 to engage in prostitution.

110. AV-3 said that once they got to Green Bay, JOHNSON rented two hotel rooms at what AV-3 believed to be a Motel 6. AV-3 believed JOHNSON and ROBERTS sold drugs during this trip, because JOHNSON's later made a statement to ROBERTS that ROBERTS "did good". At some point during the trip, ROBERTS sold drug to a man that did tattoos. The tattoo man had his equipment and told AV-3 she would give her a tattoo. AV-3 and ROBERTS got into a fight with ROBERTS. Instead of getting a tattoo, AV-3 asked the tattoo man to give her a ride back to the Milwaukee area, which he did.

111. The next day, AV-3 returned to the Sundown Motel and found JOHNSON and ROBERTS in the room. ROBERTS told AV-3 to go into the bathroom. AV-3 did not know what

31

ROBERTS and JOHNSON discussed while she was in the bathroom. Later that day, AV-3 learned that JOHNSON wanted ROBERTS to go back to Green Bay to sell drugs. AV-3 did not want ROBERTS to leave. ROBERTS left the room to tell JOHNSON this. Later that day, ROBERTS again left the hotel room. AV-3 then heard a gunshot. AV-3 exited the room and saw that ROBERTS was shot. Later, ROBERTS told AV-3 that he believed JOHNSON shot him. ROBERTS did not get medical attention for the gunshot, but instead AV-3 helped him with it. JOHNSON also provided ROBERTS with heroin to help with the pain. AV-3 described how JOHNSON later showed her a shell casing. AV-3 believed this was the casing from the shooting incident. This made AV-3 fearful of JOHNSON.

112. AV-3 stated she went back to Green Bay with JOHNSON and ROBERTS about one week later. AV-3 stated JOHNSON again used his phone to order a rideshare service to take them to Green Bay so JOHNSON and ROBERTS could sell drugs. AV-3 went with to be with ROBERTS. AV-3 stated they returned to the Motel 6 hotel during this trip. AV-3 stated Ricky and JJ were also at the motel. AV-3 believed Ricky and JJ were selling drugs also. AV-3 stated eventually she, JOHNSON, and ROBERTS took a ride share back to the Sundown Motel in Milwaukee, Wisconsin. AV-3 stated JOHNSON order the ride share using his cellphone.

113. AV-3 stated that once they got back to the Sundown motel, she arranged to do a commercial sex act. AV-3 stated the "date" was supposed to happen in the customer's car, which was around the corner from Sundown motel. AV-3 stated while in the car with the customer, she observed JOHNSON's black Dodge Charger. AV-3 stated she was afraid and asked the customer to drive away, which he did. AV-3 stated the Dodge Charger then chased her and the customer to Silver Spring and Appleton in Milwaukee, Wisconsin. At that point, she observed ROBERTS exited the Dodge Charger on the passenger side. ROBERTS approached

32

the customer's car and tried to pull AV-3 out of the car. The customer was able to help AV-3 get away from ROBERTS and then they drove off. AV-3 did not observed JOHNSON in the driver's seat of the Dodge Charger, but believes he was driving because of ROBERTS getting out on the passenger side and because JOHNSON would not let others drive his Dodge Charger. AV-3 stated she then stayed away from Sundown motel for about three days.

114. AV-3 stated she returned to the Sundown motel the last time she, ROBERTS and JOHNSON travelled to the Super 8 so AV-3 could perform commercial sex dates for JOHNSON. AV-3 explained before July 8, 2024, when she left the Sundown motel for three days, ROBERTS remained there and JOHNSON took care of him. AV-3 stated JOHNSON paid for the room and fronted drugs to ROBERTS while AV-3 was gone. When AV-3 returned JOHNSON wanted to be repaid and had AV-3 do commercial sex acts. AV-3 was afraid of JOHNSON and complied.

115. AV-3 stated she may have set up the commercial sex acts using her phone. JOHNSON drove her and ROBERTS in JOHNSON's Dodge Charger to an apartment in Milwaukee, were she performed a sex act in exchange for money. AV-3 stated she was upset because when she got to the apartment she learned there were multiple men that she had to engage in commercial sex acts with. AV-3 believes the men paid JOHNSON directly via some type of online payment method. AV-3 stated one man did give her $30, but she should have been paid a lot more money for the commercial sex acts. AV-3 believes she gave the $30 to JOHNSON for drugs.

116. AV-3 stated JOHNSON then drove ROBERTS and her in JOHNSON's Charger to a residence near 87th and Capitol Drive in Milwaukee, later determined by case agents to be 8641 West Capitol Drive, Unit D based on review of JOHNSON's recorded jail calls. Once

33

inside, JOHNSON directed AV-3 and ROBERTS to go into a closet. AV-3 stated she did not know what JOHNSON was doing while she and ROBERTS were in the closet. AV-3 eventually left the closet and the residence. She did not look for JOHNSON when she left. AV-3 began walking on Capitol Drive to a friend's house. Eventually, JOHNSON called AV-3 and told her it was time to leave. JOHNSON picked AV-3 up on 70th and Capitol. They drove back to 8641 West Capitol Drive, Unit D, to pick up ROBERTS, who was still in the closet.

117. AV-3 stated that JOHNSON then drove AV-3 and ROBERTS in JOHNSON's Charger to a location on Granville Road in Milwaukee. JOHNSON left his Charger there and ordered an Uber using his phone to take them all to Green Bay. AV-3 stated during the trip, JOHNSON may have told her to be quiet, but she does not remember anything else JOHNSON stated. AV-3 believes ROBERTS was sleeping during the trip. The Uber dropped them off at the Super 8. Upon their arrival, JOHNSON went inside to rent a room. AV-3 stated she did not remember asking the Uber driver for help or any statements made by ROBERTS or JOHNSON during this trip.

118. AV-3 stated after JOHNSON checked in, they all went to the room. AV-3 arranged commercial sex acts but then fell asleep. AV-3 was awoken to JOHNSON and ROBERTS braking in the door and yelling at AV-3. AV-3 stated JOHNSON and ROBERTS thought she failed to do a "date". AV-3 stated JOHNSON grabbed an ice bucket and hit her in the face with the bucket.

119. AV-3 then went to the front desk and asked to use their phone to call a friend to come and get her. AV-3 asked the front desk to not call 911. AV-3 stated she observed someone coming and asked the front desk if she was followed. AV-3 realized JOHNSON

followed her. AV-3 was afraid and went back to the room. AV-3 does not remember asking the front desk person for help.

120. AV-3 stated she then returned to the room and a date arrived. AV-3 engaged in a commercial sex act with the date; however, AV-3 did not receive any money. AV-3 believed that JOHNSON received the money via some type of mobile payment application. AV-3 does not remember asking the "date" for help or asking for the date to take her away from the hotel.

121. AV-3 stated police eventually came to the hotel room while the date was still present. AV-3 was scared she would be arrested for her warrant, engaging in commercial sex acts, and communing controlled substances. AV-3 provided false information to the police and provided police with a false name. AV-3 was also scare of what JOHNSON might do. AV-3 was taken to the hospital because the Green Bay Police that responded believed she had overdosed based on her physical appearance and behavior.

122. AV-3 did not know about the $300 that police located in her purse. AV-3 stated it was hard to remember some of the things that happen due to her using drugs on July 8, 2024.

123. Case agents reviewed AV-3's cell phone (XXX-XXX-1953) communications with AV-3. AV-3 identified the contact "Mone", telephone number 414-779-9015, as JOHNSON's number. AV-3 stated she used TextNow app to communicate with JOHNSON. AV-3's phone also reflected CashApp peer-to-peer financial transactions with contacts identified by AV-3 as JOHNSON. AV-3 identified her payments to JOHNSON as payments for drugs, hotel rooms, or other expenses.

### g. ROBERTS' Other Police Contacts

124. Case agents reviewed police reports regarding past incidents involving ROBERTS and AV-3. The facts and context of several of these raised concerns that ROBERTS

35

may be trafficking AV-3 for commercial sex, though AV-3 denies being trafficked by ROBERTS.

125. On March 21, 2022, the Oak Creek Police Department was dispatched to the Motel 6 located at 1201 West College Avenue in Oak Creek for a disorderly conduct complaint. AV-3 told responding officers that ROBERTS punched her during an argument.

126. On April 7, 2022, Oak Creek Police Officers conducted a knock and talk at room 105 of the LaQuinta Inn and Suites, located at 7141 South 13th Street in Oak Creek, for suspected prostitution. AV-3 was posting prostitution ads on Skipthegames.com, a website used to advertise commercial sex acts. During that investigation, Officers learned ROBERTS was the registered guest for room 105.

127. On June 9, 2022, the Hartland Police Department was dispatched to an apartment occupied by AV-3's mother. AV-3's mother called the Hartland Police because ROBERTS had made threatening phone calls and sent text messages demanding money. AV-3's mother described ROBERTS as AV-3's drug dealer, and she said she feared for AV-3's safety. AV-3's mother also indicated to Hartland Police that AV-3 is being sex trafficked by ROBERTS. Hartland Police Department reports did not provide any further information as to the sex trafficking allegations.

128. On February 29, 2024, the Oak Creek Police Department responded to the Motel 6 located at 1201 West College Avenue in Oak Creek, for a reports of a disturbance. The complainant, referred to hereinafter as Adult Citizen 3 (AC-3), was conveyed to the Oak Creek Police Department for a consensual interview with me regarding AC-3's boyfriend sex trafficking her. During that interview, I located an advertisement on Skipthegames.com from February 1, 2024 depicting AC-3. More recently, I discovered that the phone number used in the

36

February 29, 2024 ad for AC-3 was the same phone number used in other commercial sex ads for AV-3. AC-3 identified AV-3 and ROBERTS from booking photos. AC-3 described ROBERTS as AV-3's pimp.

### E. Probable Cause to Search the DEVICES

129. Based on my training and experience, I know that persons (to include Mario ROBERTS and Morrell JOHNSON) who engage in ongoing sex trafficking and criminal drug trafficking utilize cellular devices to further their activities. Further, based on the above facts, ROBERTS and JOHNSON both used the **DEVICES** to engage in drug trafficking and sex trafficking.

130. I know that traffickers like ROBERTS and JOHNSON use cellular telephones and other electronic devices to manage and maintain their sex trafficking operations, such as by recruiting new victims via social media, text apps, or with SMS/MMS messages, posting commercial sex ads, communicating with clients, obtaining payments from customers, navigating to hotels, outcall locations for dates, or prostitution tracks, and communicating with victims to instruct, threaten, and otherwise exercise control over them. The above facts provide examples of both JOHNSON and ROBERTS engaging many of these types of activities.

131. Additionally, I know that drug traffickers utilize cellular devices to maintain contact with other affiliates and store information relating to drug trafficking. I know that evidence of drug trafficking can be held on the photographs, videos, call logs, text messages, contact lists, and otherwise stored digital information. I know that drug traffickers often record images and/or videos depicting narcotic evidence, maintain contact with others regarding drug trafficking through cellular devices which would be recorded in call logs and text messages, as well as maintain a contact list of affiliates within their cellular devices for personal reference and

37

use. I know that additional evidence of drug trafficking would be stored within other digital stored memory of the cellular devices, and that law enforcement investigators could retrieve the electronically stored evidence if accessible. The above facts provide examples of both JOHNSON and ROBERTS engaging in drug trafficking and using the **DEVICES** to further their drug trafficking.

132. The **DEVICES** are currently in the lawful possession of the FBI Milwaukee. Based on my training and experience, as well as my work with fellow law enforcement officers, I know that the **DEVICES** have been securely stored in such a way that their contents are, to the extent material to this investigation, in substantially the same state as they were when the **DEVICES** first came into the possession of the FBI.

## **TECHNICAL TERMS**

133. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

38

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a

39

Case 2:24-mj-00181-WED     Filed 08/16/24     Page 40 of 54     Document 1

GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

134. Based on my training, experience, and research, I know that the **DEVICES** have capabilities that allow them to serve as wireless telephones, digital cameras and video recorders, portable media players, internet web browsers, and GPS navigation devices. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **DEVICES**.

40

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

135.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the **DEVICES**. This information can sometimes be recovered with forensics tools.

136.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **DEVICES** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **DEVICES** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

41

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

137.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

138.    *Manner of execution.* Because this warrant seeks only permission to examine the **DEVICES** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

42

## CONCLUSION

139.    Based on the above information provided in this affidavit, I believe there is probable cause that the **DEVICES** contain evidence of violations of Title 18, United States Code, Section 1591(a) (sex trafficking) and Title 21, United States Code, Sections 841 (possession with intent and distribution of controlled substances) and 846 (conspiracy to possess with intent and distribution of controlled substances).

43

**ATTACHMENT A**
**Property to be Search**

The property to be searched consists of two cellular phones recovered during the arrests of Mario ROBERTS and Morrell D. JOHNSON on July 8, 2024, in Green Bay, Wisconsin, hereinafter referred as the "**DEVICES**." The **DEVICES** are more particularly described as follows:

a) a locked black Apple iPhone, with a black case, believed to have telephone number 414-690-4529, located in the backseat of a blue Buick with license plate ATG7892 near 850 Kepler Drive, Green Bay, Wisconsin, on July 8, 2024, that is currently held as evidence inside the FBI Milwaukee Field Office (**DEVICE A**); and

b) a locked Apple iPhone, with a red leather back, which was inside the purse in hotel room 226 of the Super 8 Motel, 2911 Voyager Drive, Green Bay, Wisconsin, on July 8, 2024, that is currently held as evidence inside the FBI Milwaukee Field Office (**DEVICE B**).

The applied-for warrant would authorize the forensic examination of the **DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

44

## ATTACHMENT B

### Particular Things to be Seized

1. All records and information on the **DEVICES** described in Attachment A that relate to violations of Title 18, United States Code, Section 1591(a) (sex trafficking), and Title 21, United States Code, Sections 841 (possession with intent and distribution of controlled substances) and 846 (conspiracy to possess with intent and distribution of controlled substances), including:

 a. Preparatory steps taken in furtherance of these crimes;

 b. Any audio, video, photograph(s) travel records, information related to the identity of victims, and any other content or records on the phone of criminal activity for the above offenses or of evidentiary value;

 c. All voicemail and call records;

 d. Electronic communications of any kind, including text messages, instant messages, social media, multimedia messaging, audio messages, voicemails, communications in third party apps, and emails, between ROBERTS and/or JOHNSON and known or prospective victims or customers of the crimes under investigation or concerning the crimes under investigation or others engaged in human and/or drug trafficking;

 e. All call logs;

 f. Contact list, to include names, addresses, phone numbers, and/or email addresses and records of communication with those contacts including call logs and written messages of any kind;

 g. All social media sites used and applications for social media sites;

 h. Lists of customers and related identifying information;

 i. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

 j. Types, quantities, and prices of firearms possessed;

45

k. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

l. All bank records, checks, credit card bills, account information, and other financial records.

m. All internet activity, including all web browsing history;

n. Evidence of user attribution showing who used or owned the **DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, saved usernames and passwords, documents, and browsing history, user profiles, messaging logs, photographs, and correspondence;

o. Evidence of software that would allow others to control the phone, such as viruses, and other forms of malicious software;

p. Evidence indicating how and when the phone was accessed or used to determine the chronological context of access, use, and events relating to the crime under investigation and the user;

q. Records of or information about the computer's internet activity, such as firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

r. Contextual information necessary to understand the evidence described in this attachment, such as contact lists, address books, and notes;

s. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, any downloaded applications and Internet Protocol addresses; and

t. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

    i. records of Internet Protocol addresses used;

    ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

46

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

47

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original ☐

CLERK'S OFFICE
A TRUE COPY
Aug 16, 2024
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of )
)
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 24 MJ 181
A locked black Apple iPhone, with a black case, believed to have telephone )
number 414-690-4529 (Device A) and a locked Apple iPhone, with a red )
leather back (Device B), that are currently held as evidence inside the )
Milwaukee FBI Field Office, more fully described on Attachment A. )
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:
See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____08/30/2024_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable William E. Duffin_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      08/16/2024 at 9:20 a.m.                                    *William E. Duffin*
                                                                                        *Judge's signature*

City and state:   Milwaukee, WI                    Hon. William E. Duffin, United States Magistrate Judge
                                                        *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
### Property to be Search

The property to be searched consists of two cellular phones recovered during the arrests

of Mario ROBERTS and Morrell D. JOHNSON on July 8, 2024, in Green Bay, Wisconsin,

hereinafter referred as the "**DEVICES**." The **DEVICES** are more particularly described as

follows:

a) a locked black Apple iPhone, with a black case, believed to have telephone number 414-690-4529, located in the backseat of a blue Buick with license plate ATG7892 near 850 Kepler Drive, Green Bay, Wisconsin, on July 8, 2024, that is currently held as evidence inside the FBI Milwaukee Field Office (**DEVICE A**); and

b) a locked Apple iPhone, with a red leather back, which was inside the purse in hotel room 226 of the Super 8 Motel, 2911 Voyager Drive, Green Bay, Wisconsin, on July 8, 2024, that is currently held as evidence inside the FBI Milwaukee Field Office (**DEVICE B**).

The applied-for warrant would authorize the forensic examination of the **DEVICES** for

the purpose of identifying electronically stored data particularly described in Attachment B.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

1.      All records and information on the **DEVICES** described in Attachment A that relate to violations of Title 18, United States Code, Section 1591(a) (sex trafficking), and Title 21, United States Code, Sections 841 (possession with intent and distribution of controlled substances) and 846 (conspiracy to possess with intent and distribution of controlled substances), including:

    a.   Preparatory steps taken in furtherance of these crimes;

    b.   Any audio, video, photograph(s) travel records, information related to the identity of victims, and any other content or records on the phone of criminal activity for the above offenses or of evidentiary value;

    c.   All voicemail and call records;

    d.   Electronic communications of any kind, including text messages, instant messages, social media, multimedia messaging, audio messages, voicemails, communications in third party apps, and emails, between ROBERTS and/or JOHNSON and known or prospective victims or customers of the crimes under investigation or concerning the crimes under investigation or others engaged in human and/or drug trafficking;

    e.   All call logs;

    f.   Contact list, to include names, addresses, phone numbers, and/or email addresses and records of communication with those contacts including call logs and written messages of any kind;

    g.   All social media sites used and applications for social media sites;

    h.   Lists of customers and related identifying information;

    i.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    j.   Types, quantities, and prices of firearms possessed;

k. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

l. All bank records, checks, credit card bills, account information, and other financial records.

m. All internet activity, including all web browsing history;

n. Evidence of user attribution showing who used or owned the **DEVICES** at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, calendars, saved usernames and passwords, documents, and browsing history, user profiles, messaging logs, photographs, and correspondence;

o. Evidence of software that would allow others to control the phone, such as viruses, and other forms of malicious software;

p. Evidence indicating how and when the phone was accessed or used to determine the chronological context of access, use, and events relating to the crime under investigation and the user;

q. Records of or information about the computer's internet activity, such as firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

r. Contextual information necessary to understand the evidence described in this attachment, such as contact lists, address books, and notes;

s. All records evidencing travel and device location information, including GPS locations, map or navigation apps, phone tracking apps, any downloaded applications and Internet Protocol addresses; and

t. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

    i. records of Internet Protocol addresses used;

    ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3